CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

UNITED STATES DISTRICT COURT   2016 JUL 20   PM 3:05
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION   DEPUTY CLERK_____

| | |
|---|---|
| UNITED STATES OF AMERICA, the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, WISCONSIN, the Commonwealth of MASSACHUSETTS, VIRGINIA, and the DISTRICT OF COLUMBIA *ex rel.*, ASHLEY MILLER and SAKSF, LLC,<br><br>                    Plaintiffs,<br><br>      v.<br><br>ABBVIE, INC. and ABBVIE ENDOCRINOLOGY, INC. D/B/A PHARMACY SOLUTIONS,<br><br>                    Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § § § §   Civil Action No. _____<br><br>   **3-16 CV2111-G** |

## COMPLAINT OF THE UNITED STATES

## FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730

The United States of America (the "United States") and the Plaintiff States (defined below) (the United States and Plaintiff States are collectively referred to herein as the "Government"), by and through their *qui tam* Relators, Ashley Miller ( "Ms. Miller") and SAKSF, LLC ("SAKSF") (Ms. Miller and SAKSF shall collectively be referred herein as, "Relators"), bring this action under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "False Claims Act" or "FCA") and the false claims acts of the respective Plaintiff States against defendants AbbVie, Inc. ("AbbVie") and its wholly-owned specialty pharmacy, AbbVie Endocrinology Inc. d/b/a Pharmacy Solutions ("Pharmacy Solutions") (Pharmacy Solutions and AbbVie shall collectively be referred herein as, "Defendants"), to recover all damages, penalties, and other remedies provided by the False Claims Act, and analogous state statutes,[1] and for their complaint ("Complaint") allege:

---

[1]     Specific citations for relevant state *qui tam* statutes are as follows: California False Claims Act, Cal. Gov't Code § 12650 *et seq.*; Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*; Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*; Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*; Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*; Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*; Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*; Illinois False Claims Act, 740 ILCS 175/1 *et seq.*; Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*; Iowa False Claims Law, I.C.A. § 685.1 *et seq.*; Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*; Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*; Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*; Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*; Montana False Claims Act, MCA § 17-8-401 *et seq.*; Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq.*; New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*; New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*; North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*; Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*; Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*; Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*; Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*; Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*; Virginia Fraud Against Tax Payers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; and District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*

1.      Based on the Relators' personal knowledge and further investigation, including

statements from various confidential witnesses ("CWs") sufficient evidence exists to allege that

Defendants have violated and continue to violate the False Claims Act, the Anti-Kickback Statute,

42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute" or "AKS"), and the false claims acts of the

respective Plaintiff States, by submitting fraudulent bills to the Government (and/or through its

conduct in causing others to submit fraudulent bills to the Government) as a result of an unlawful

marketing scheme.

2.      By way of background, drugs like AbbVie's Humira are very expensive. Humira,

for example, can cost between $1000-$2000 or more per month.  Given the cost, prescription drug

plans, including Government plans such as Medicare and Medicaid, are simply not willing to

automatically cover such drugs merely because a physician believes it is appropriate for a given

patient.  As a result, in order for drugs like Humira to be covered by insurers, providers must

undertake a lengthy and expensive process to "prove" to insurers that the drug is needed for their

patient and should be covered.  This process can take a doctor's staff up to 90 minutes per

prescription, a substantial commitment of time and resources for a provider, who will *not* be

reimbursed for his/her time or the time of his/her staff.  As an alternative, equally distasteful and

unreimbursed, providers may elect to outsource the pre-approval process to a third party, which

typically costs a provider $50-$80 per prescription.  Capitalizing on this conundrum facing

providers, AbbVie created programs that subsidize providers' costs of obtaining coverage to

induce providers to write more prescriptions for their drugs.  Such programs are illegal.

3.      In this case, AbbVie developed and staffed a concierge of free services that they

marketed along with AbbVie's drugs in order to induce prescribers – such as primary care

providers, rheumatologists, and gastroenterologists – to prescribe its drugs.  That is, in exchange

for prescribing AbbVie drugs, AbbVie, through its wholly owned subsidiary Pharmacy Solutions, would assume providers' administrative costs associated with getting patients approved for therapy utilizing AbbVie's drugs. The primary incentive that these programs offer are Reimbursement Support ("RS") services. In practice, the more a provider prescribed AbbVie drugs, as a percentage of his or her overall prescription volume, the more RS services Abbvie would provide. More RS services resulted in greater savings to the practice, and therefore profit, as the time and money spent on reimbursement issues would fall on AbbVie, not the prescribing provider. In this way, AbbVie's reimbursement services induced providers to prescribe AbbVie's costly products over cheaper alternatives. The value of the RS services AbbVie was providing prescribers was approximately worth $50-$80 for each prescription written for AbbVie's specialty drugs like Humira. As a result, every prescription written by providers participating in AbbVie's RS program was tainted by a violation of the Anti-Kickback Statute and, thus, any such claim submitted for reimbursement to the Government was necessarily rendered false within the meaning of the False Claims Act.

4.      As a result of AbbVie's misconduct, the Government paid these false claims and suffered substantial losses. In Relators' estimate, approximately 50% of all Humira dispensed in the United States and covered by Medicare was dispensed pursuant to prescriptions from providers enrolled in Defendants' RS services program. According to Relator Ashley Miller, the provision of RS services by AbbVie was a material factor in providers' decisions to prescribe Humira instead of other, therapeutically equivalent drugs. According to Relator Miller, providers "loved" the service and prescribed Humira preferentially as a result of the time and money it saved them.

5.      From a purely financial standpoint, the benefits to AbbVie from offering providers its RS services were massive: in just 2012, for example, AbbVie sold $4.3 billion worth of Humira

in the United States.  And as the years have passed, AbbVie's sales have continued to grow –

clearing $14 billion worldwide in 2015, and are forecasted to hit $20 billion by 2020.

      6.      Substantial conduct by Defendants took place in this District.  As discussed, herein,

one of AbbVie's own Humira Sales Representatives stated to Relators that the improper conduct

complained of herein took place in his sales territory, which included Dallas.

      7.      As a result of AbbVie's misconduct, the Government paid these false claims and

suffered substantial losses.  In Relators' estimate, approximately 50% of all Humira dispensed in

the United States and covered by Medicare was dispensed through providers enrolled in

Defendants' Reimbursement Support ("RS") services program.  According to Ashley Miller, the

Relators, the provision of RS services by AbbVie was a material factor in a provider's decision to

prescribe Humira instead of another, equivalent, drug – in her words, providers "loved" the service

and prescribed Humira preferentially as a result of the time and money it saved them.  From a

purely financial standpoint, the benefits to AbbVie from offering providers its RS services were

massive: in just 2012, for example, AbbVie sold $4.3 billion worth of Humira in the United States.

And as the years have passed, AbbVie's sales have continued to grow – clearing $14 billion

worldwide in 2015, and are forecasted to hit $20 billion by 2020.

## PARTIES

      8.      Ms. Miller was employed by Pharmacy Solutions as a Trainer from February 2012

through September 2014 and, prior to that, as an Insurance Analyst at Pharmacy Solutions from

April 2011 to February 2012.  Ms. Miller's job was to train AbbVie Sales Representatives, as well

as to train in-house sales representative trainers at AbbVie itself.  Specifically, Ms. Miller was

tasked with ensuring that AbbVie's sales representative trainers were fully versed in the mechanics

of the universe of RS services that Pharmacy Solutions could perform.  RS, discussed in more

detail below, is an industry term used to describe Insurance Support Services, Pharmacy Services and Financial Assistance Research services that are provided to assist companies in making sure that prescriptions for their drugs are covered by insurance (both private and public), dispensed properly by pharmacies, and made available to the broadest consumer market possible. RS services have great value to providers; particularly to those who prescribe specialty drugs such as Humira, as it is often an uphill battle to get insurers to cover such drugs. Given the importance of RS to AbbVie's bottom line, it was critical for AbbVie to make sure that its Sales Representatives knew what RS services could be offered to providers, how to use those services, and most importantly, how to use those services to gain leverage to convince providers to write prescriptions for AbbVie's drugs.

9.      SAKSF, LLC is a Delaware limited liability corporation formed to investigate and prosecute this matter with Ms. Miller.

10.     Plaintiff United States, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ("Medicare").

11.     The Plaintiff States are the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Washington, Wisconsin, the Commonwealths of Massachusetts and Virginia, and the District of Columbia. They each bring claims for Defendants' violations of their respective state false claims acts, as set forth in detail in Counts II-XXXII.

12.     Defendant AbbVie, headquartered in North Chicago, Illinois, is one of the world's largest pharmaceutical companies.  Formerly part of Abbott Laboratories, AbbVie split off from that company on January 1, 2013.  During its first year in operation, AbbVie managed to net $18.8 billion, a figure which grew to $20 billion in 2014.  Much of its initial revenue generated was due to its assuming control of the company's flagship medications following the Abbott/AbbVie split – Humira, Kaletra, AndroGel, Vicodin, Niaspan, and Tricor.

13.     Leading this catalog of drugs is Humira, a specialty drug which is currently the most popular and profitable drug in AbbVie's portfolio.  Used to treat everything from rheumatoid arthritis to psoriasis, Crohn's disease, and ulcerative colitis, Humira was the world's top selling drug in 2013.  This rise translated into $10.7 billion in sales in 2013, $12.5 billion in 2014, and $14 billion in 2015, which together make up 57% of AbbVie's total sales in 2013, 62% of their total sales in 2014, and 64% of their total sales in 2015.  While Lipitor has been lauded as the biggest blockbuster drug of all time, garnering $141 billion since its launch, Humira is poised to surpass Lipitor in terms of total revenue within the next few years.  Humira is not a cheap drug.  Estimates vary, but on average, an annual supply of Humira costs from $25,000 to $40,000.  Humira is a lifetime drug; that is, once the drug is prescribed, patients remain on the drug for the rest of their lives even if their disease symptoms abate.  As such, AbbVie management recognizes that once a patient is prescribed Humira, AbbVie can look forward to hundreds of thousands of dollars in future revenue over the course of that patient's lifetime.

14.     Humira is scheduled to come off patent in 2016.  At that time, AbbVie's 15 billion dollar franchise drug expects to face stiff competition from much cheaper generic drug manufacturers.  This development will have a significant effect on Humira sales, AbbVie's overall profitability, and, more importantly to management, its stock price.  As such, AbbVie has

developed a multi-faceted sales strategy to not only boost the initial sales of Humira, but also to ensure that providers continue to prescribe Humira rather than the cheaper generics.

## JURISDICTION AND VENUE

15.     Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331.

16.     The Court may exercise personal jurisdiction over the Defendants, and venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because the acts proscribed by 31 U.S.C. § 3729 *et seq.*, and complained of herein took place in part in this District and the Defendants transacted business in this District as described herein.

17.     Pursuant to 31 U.S.C. § 3730(b)(2), Relators prepared and will serve the Complaint on the Attorney General of the United States, and the United States Attorney for the Northern District of Texas, as well as a statement of all material evidence and information currently in its possession and of which it is the original source.  These disclosure statements are supported by material evidence known to the Relators at the time of filing establishing the existence of Defendants' false claims.  Because the statements include attorney-client communications and work product of Relators' attorneys, and will be submitted to those Federal officials in their capacity as potential co-counsel in the litigation, Relators understand these disclosures to be confidential and exempt from disclosure under the Freedom of Information Act.  5 U.S.C. § 552; 31 U.S.C. § 3729(c).

## LEGAL BACKGROUND

### *The False Claims Act*

18.     The False Claims Act provides, in pertinent part:

(a) Liability for Certain Acts.—

(1) In general.— Subject to paragraph (2), any person who—

   (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

   (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

   (C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

   (D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

   (E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

   (F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or

   (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.— A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions.— For purposes of this section—

   (1) the terms "knowing" and "knowingly"—

      (A) mean that a person, with respect to information—

         (i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"—

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

19.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 C.S.C. § 2461 (notes), and 28

C.F.R. § 85.1, False Claims Act civil penalties were increased from $5,000 to $11,000 for violations occurring on or after September 29, 1999.

### *The Anti-Kickback Statute*

20.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits offering to pay or paying any remuneration[2] "to any person to induce such person to purchase . . . any good . . . service, or item for which payment may be made in whole or in part under a Federal health care program." *Id.* § 1320a-7b(b)(2)(B). Pursuant to the Anti-Kickback Statute, it is unlawful to knowingly offer or pay any remuneration in cash or in kind in exchange for the referral of any product (including a prescription drug product) for which payment is sought from any federally-funded health care program, including Medicare, Medicaid and TRICARE. In order to ensure compliance, every federally-funded health care program requires every provider or supplier to ensure compliance with the provisions of the Anti-Kickback Statute and other federal laws governing the provision of health care services in the United States.

21.     A violation of the Anti-Kickback Statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the Anti-Kickback Statute must be excluded from federal health care programs for a term of at least five years. 42 U.S.C. §§ 1320a-7(a)(1), 1320a-7(c)(3)(B).

22.     Compliance with the Anti-Kickback Statute is required for reimbursement of claims from federal health care programs, and claims made in violation of the law are actionable civilly under the FCA. 42 U.S.C. § 1320a-7b(g) (2010) (stating, in part, that a "claim that includes items or services resulting from a violation of . . . [the Anti-Kickback Statute] constitutes a false

---

[2]     The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1).

or fraudulent claim for purposes of [the FCA]. . . ."); *see also United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 313-14 (3d Cir. 2011) (stating "[c]ompliance with the AKS is clearly a condition of payment under Parts C and D of Medicare" and holding that "appellants, by alleging that appellees violated the AKS while submitting claims for payment to a federal health insurance program, have stated a plausible claim for relief under the FCA."). Therefore, compliance with the Anti-Kickback Statute is a condition of payment under federal health care programs.

23.     The Anti-Kickback Statute was amended in March 2010 as part of the Patient Protection and Affordable Care Act ("PPACA"), which clarified that all claims resulting from a violation of the Anti-Kickback Statute are also a violation of the FCA.  Pub. L. No. 111-148, § 6402; 42 U.S.C. § 1320a-7b(g).  The PPACA also amended the Social Security Act's ("SSA") "intent requirement" to make clear that violations of its anti-kickback provisions, like violations of the FCA, may occur even if an individual does "not have actual knowledge" or "specific intent to commit a violation."  Pub. L. No. 111-148, § 6402; 42 U.S.C. § 1320a-7b(h).

## FACTUAL BACKGROUND

### I.     Overview of Medicare and Its Benefits

24.     Medicare is a federal health insurance system, created in 1965 under the provisions of the SSA, for people 65 and older and for people under 65 with certain disabilities.

25.     Medicare Part D began January 1, 2006, and pays for prescription drug benefits for the elderly and disabled.  42 U.S.C. § 1395w-101 *et seq*.  All persons enrolled in Medicare Part A and/or Medicare Part B are eligible to enroll in a prescription drug plan under Part D.  HHS, through its component agency, CMS, contracts with private companies (or "sponsors") authorized to sell Part D insurance coverage.  Such companies are regulated and subsidized by CMS pursuant

to one-year, annually renewable contracts.

26.     Medicare Part D requires all participants in the program – prescription drug plan ("PDP") sponsors, Pharmacy Benefit Managers ("PBM"), and pharmacies – to adhere to all federal laws and regulations, including those designed to prevent fraud, waste, and abuse.  42 C.F.R. § 423.505(h)(1).  Under CMS regulations, PDP sponsors' subcontracts with PBMs and pharmacies must contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions.  42 C.F.R. § 423.505(i)(3)(v).

27.     A covered Part D drug is a Part D drug that is included in a Part D sponsor's formulary, or treated as being included in a Part D plan's formulary as a result of a coverage determination or appeal under 42 C.F.R. §§ 423.566, 423.580, 423.600, 423.610, 423.620 and 423.630, and obtained at a network pharmacy or an out-of-network pharmacy in accordance with 42 C.F.R. § 423.124.

## II.    Overview of Medicaid and Its Benefits

28.     Medicaid is a joint federal-state program also created in 1965 under the provisions of the SSA that provides health care benefits for certain groups, primarily the poor and disabled. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b).  Among the states, the FMAP is at least 50 percent and is as high as 83 percent.

29.     The Medicaid program pays for services pursuant to plans developed by the states and approved by the HHS Secretary through CMS.  42 U.S.C. § 1396a(a)-(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates.  42 U.S.C. §§ 1396b(a)(1), 1903(a)(1).  The federal government then pays

each state a statutorily-established share of "the total amount expended . . . as medical assistance under the State plan . . . ." *See* 42 U.S.C. § 1396b(a)(1). This federal-to-state payment is known as federal financial participation ("FFP").

30.     The Medicaid programs of all states reimburse for prescription drugs. The vast majority of states award contracts to private companies to evaluate and process claims for payment on behalf of Medicaid recipients. Typically, after processing the claims, these private companies then generate funding requests to the state Medicaid programs. Before the beginning of each calendar quarter, each state submits to CMS an estimate of its Medicaid federal funding needs for the quarter. CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding each state will be permitted to draw down as it incurs expenditures during the quarter. The state then draws down federal funding as actual provider claims, including claims from pharmacies seeking payment for drugs, are presented for payment. After the end of each quarter, the state then submits to CMS a final expenditure report, which provides the basis for adjustment to the quarterly federal funding amount (to reconcile the estimated expenditures to actual expenditures). 42 C.F.R. § 430.30.

## III.     The TRICARE Program

31.     TRICARE, formerly known as CHAMPUS (Civilian Health and Medical Program of the Uniformed Services), is a managed health care program established by the United States Department of Defense ("DoD"). 32 C.F.R. § 199.17; *see also* 10 U.S.C. §§ 1071-1110. TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents.

32.     The DOD offers comprehensive health care coverage – pharmacy and medical benefits – to eligible beneficiaries through its TRICARE program. As part of its benefits package,

14

TRICARE pays for prescription drugs.

33.      TRICARE will not pay claims that violate its fraud, abuse, and conflict of interest regulations. 32 C.F.R. § 199.9.  Specifically, TRICARE will not reimburse claims if: (1) the provider has a pattern of waiving beneficiaries cost-share or deductible amounts; or (2) the provider enters arrangements with employees, independent contractors, suppliers, or others which appear to be designed primarily to overcharge [the TRICARE program] through various means (such as commissions, fee-splitting, and kickbacks) used to divert or conceal improper or unnecessary costs or profits. 32 C.F.R. § 199.9 (b)(1) and (c)(12).  Moreover, TRICARE will not reimburse claims submitted pursuant to a conflict of interest. 32 C.F.R. § 199.9 (d).  Pursuant to TRICARE regulations, a conflict of interest includes "any situation where an active duty member of the Uniformed Services . . . or civilian employee of the United States Government, through an official federal position has the apparent or actual opportunity to exert, directly or indirectly, any influence on the referral of [TRICARE] beneficiaries to himself/herself or others with some potential for personal gain or the appearance of impropriety." 32 C.F.R. § 199.9 (d)(1).

## V.      **Defendants' Fraudulent Conduct**

### A.      **Defendants' Wrongful Conduct**

34.      Kickback schemes of all types always involve two transactional parties.  The first is the "payer," or the party paying the remuneration.  The other is the "payee," or the party receiving the remuneration.  Kickback schemes also involve a desired and intended unlawful outcome by the payer.  That desired outcome includes either a "referral" or a "recommendation" for business to the payer from the payee.  As illustrated below, although a "referral" and a "recommendation" are slightly different outcomes, each outcome is subject to Anti-Kickback Statute ("AKS") scrutiny.

35.     To illustrate, a home health agency would act unlawfully if it paid remuneration to a provider to induce the provider to *refer* patients to that home health agency.  In this scenario, the provider is making a direct *referral* of a patient to the home health agency.  In pharmaceutical sales, this kickback transactional framework is similar, though not identical, because providers do not *refer* patients to the pharmaceutical company in the traditional sense.  Instead, providers make *recommendations* by writing prescriptions for one drug as opposed to a competing drug.  In this transactional framework, a pharmaceutical company acts unlawfully if it pays remuneration to a provider in order to induce the provider to *recommend* its drug.[3]

36.     A pharmaceutical company's violation of the AKS causes false claims to be "presented" to the government for payment.  These false claims are not directly presented by the pharmaceutical company, but rather the claim for payment comes from the pharmacy where the patient has the drug prescription filled.  Each time a pharmacy fills a patient's prescription, it submits (i.e., "presents") a claim for payment to the patient's insurance carrier (*e.g.*, Medicare, Medicaid, etc.) for the drug.  When submitting these claims to the government, all pharmacies must also certify in writing that the claim being submitted for payment is *not* "tainted" or in violation of the AKS.  Yet, because of the pharmaceutical company's AKS violation in inducing the recommendation in the first place, the certification submitted by the pharmacy *is* false because the pharmaceutical company gave unlawful "in kind" remuneration to the provider to make the recommendation in the first place.  It is in this fashion that AbbVie's AKS violations "caused a

---

[3]      The AKS makes it illegal to knowingly and willfully offer [] or pay [] any remuneration ... to any person to induce such person to '... *recommend* purchasing' a drug that is covered by a federal health care program.

false statement to be made [by the filling pharmacy] for the purpose of getting a false claim paid."[4]

37.     As already noted, above, Defendants developed and staffed a concierge of free services that they marketed along with AbbVie's drugs in order to increase the likelihood that prescribers – such as primary care providers, rheumatologists, and gastroenterologists – would prescribe its drugs.  Put simply, in exchange for prescribing AbbVie drugs, AbbVie, through Pharmacy Solutions would assume providers' administrative costs associated with getting patients on therapy utilizing AbbVie's drugs.   The more a provider prescribed AbbVie drugs as a percentage of its overall prescription volume, the greater the savings to the practice and thus profit, as time and money spent on reimbursement issues would fall on AbbVie.  In this way, AbbVie's reimbursement services served as an inducement to providers to prescribe AbbVie's costly products over cheaper alternatives.  As a result of AbbVie's misconduct, the Government paid these false claims and suffered a substantial loss.

38.     At issue here, AbbVie's drug Humira is categorized as a "specialty" drug. Typically, specialty drugs are high-cost prescription medications used to treat complex, chronic conditions like cancer, rheumatoid arthritis and multiple sclerosis.  Specialty drugs often require special handling (like refrigeration during shipping) and administration (such as injection or infusion).  Depending on how it is administered, a specialty drug may be covered by a patient's medical benefit or prescription drug benefit.  If the patient takes a pill or self-injects the drug at home, the medication is more likely to be covered through a prescription drug benefit like Medicare Part D.  If the patient receives the drug at a doctor's office or an outpatient clinic, it is more likely to be covered through the medical benefit like Medicare Part B.

---

[4]     31 U.S.C. §§ 3729(a)(2) and (a)(3) (2008); *US ex. rel. Westmoreland v. Amgen*, 738 F. Supp. 2d 267, 272 (D. Mass. 2010).

39.     Specialty drugs are very expensive – $1,000 or more per month – and the cost of these drugs is growing by about 15 to 20 percent a year.  Many prescription drug plans that cover specialty drugs will place them on what is known as a "tier" which means that the plan will limit the amount it will pay for the drug.  Each prescription drug plan treats each specialty drug differently in terms of how the drug is covered, authorized, and reimbursed.

40.     In theory, any licensed pharmacy can dispense any pharmaceutical product including specialty drugs.  In practice, manufacturers often find it advantageous to restrict channels for their specialty drugs by using "specialty pharmacies."  There are approximately 250 specialty pharmacies in the U.S.  According to IMS Health data, these specialty pharmacies generate $160 billion in annual sales, which is approximately a third of all pharmaceutical sales.[5]

41.     At issue in this case is "Pharmacy Solutions," which purports to be one of the 250 specialty pharmacies that distribute specialty drugs in the U.S.  But Pharmacy Solutions is not a traditional specialty pharmacy.  That is, it: (i) is owned by AbbVie, a pharmaceutical company, whereas most others are independent of pharmaceutical companies; and (ii) it *only* fills and dispenses drugs that are manufactured by AbbVie, where the others typically will contract with multiple manufacturers and distribute their drugs.  Pharmacy Solutions also operates in the same corporate complex as AbbVie itself.

42.     Further, the little publicly available information about Pharmacy Solutions suggests that it is far more a reimbursement support provider than an actual pharmacy.  For example, on October 22, 2015, AbbVie stated on its website:

> • AbbVie owns Pharmacy Solutions, which was obtained at the time of the dissolution of the Takeda Abbott Pharmaceuticals joint venture in 2008.

---

[5] IMS Institute for Healthcare Informatics. Medicines Use and Spending Shifts: A Review of the Uses of Medicines in the U.S. in 2014; April 2015.

- Pharmacy Solutions primarily provides patients and physicians with verification of insurance coverage for medications that require prior authorization, such as Lupron, Humira and Duopa.

- Pharmacy Solutions also has the capability to dispense medicines directly to patients, although very few patients use this service.  There are less than 1,500 patients and the revenue from Pharmacy Solutions is less than 0.2% of U.S. sales.

- AbbVie books no sales to Pharmacy Solutions.

43.    Thus, fewer than 1,500 patients get their medications filled by Pharmacy Solutions. This small patient group represents a small fraction of the total number of patients who use AbbVie's three main products, Lupron, Humira and Duopa.  Further, according to the statement, Pharmacy Solutions' specialty pharmacy services also earns a small fraction of revenue (<0.2%) from filling this small group of patients' medication.  However, despite filling so few prescriptions and earning miniscule revenue, AbbVie has made a huge investment in terms of infrastructure and manpower to operate Pharmacy Solutions.  That investment is used to employ hundreds of skilled specialists whose job is to support and assist providers who prescribe AbbVie's drugs.  These support services, detailed below, help drive AbbVie's sales and are the gravamen of the allegation herein.

44.    The services offered to providers by Pharmacy Solutions are set forth on AbbVie's web-page, including:

Insurance Support Services
- Benefit verification and prior authorization assistance

Pharmacy Services
- Medication dispensing and delivery coordination
- Forwarding of the prescription to an in-network specialty pharmacy or patient-preferred pharmacy if Pharmacy Solutions is not in-network to dispense

Financial Assistance Research
- AbbVie-sponsored co-pay card eligibility
- Referrals to independent co-pay foundations or the AbbVie Patient

Assistance Foundation

45.     Within the pharmacy industry, these three groups of services – Insurance Support

Services, Pharmacy Services and Financial Assistance Research – are referred to as RS services.

Generally, RS services have great value to providers; particularly to those who prescribe specialty

drugs such as Humira.  Providers benefit directly from this value because these RS services reduce,

and in some instances eliminate entirely a provider's administrative costs that are associated with

prescribing specialty drugs.

46.     Moreover, these RS services contribute to a provider's overall profitability.  This

increase in profitability is most prevalent for "office-based" providers.

47.     Office-based providers are those providers who derive most of their revenue from

billing 15, 30, and 45-minute units of service provided to patients during office visits.  The

technical term for an office visit is "evaluation-and-management services" or "E/M" for short.  In

2012, the most commonly billed Medicare physician service was the $70 "doctor office visit" for

a 15-minute consultation, closely followed by the $100 "doctor office visit" for a 30-minute

consultation.  Medicare pays over $11 billion each year for E/M services alone.  Medicaid and

private insurers also pay many more billions each year.

48.     When an office-based provider receives payment for an E/M service, part of the

payment compensates the provider not only for the actual medical care given to a patient, but also

for other administrative tasks associated with that patient's care.  For example, if a provider

receives a $50 payment for an E/M service provided during a routine office visit, a portion of that

$50 is intended to compensate the provider for the administrative tasks inherent in managing that

patient's care.  These administrative tasks can include conducting insurance benefit verification,

helping patients understand drug formulary lists and tiers, telephone calls to patients, responding

to patient complaints, returning messages and faxes, handling prescription refill requests and, where necessary, obtaining "prior authorizations" ("PA") in addition to managing the resultant paper trail. For years, industry research has demonstrated the enormous administrative costs and expenses incurred by providers when prescribing. Due to such expenses, a portion of each provider's E/M reimbursement is designated for the administrative services associated with prescribing and managing a patient's medications.

49.     Importantly, office-based providers are not permitted to charge patients a fee for writing prescriptions, conducting benefits verification, and/or obtaining a prior authorization because the payer-physician contract prohibits charging such fees. Rather, providers are paid for these services indirectly through the E/M unit charge.

50.     As a provider's E/M reimbursement for each office visit is fixed, there is a strong incentive for providers to find ways to combat overhead costs and expenses in order to earn more profit from each E/M unit billed. One way to do so is to reduce the administrative costs associated with prescribing a drug. That is, if a provider is successful and can reduce such costs, his or her margin is greatly increased; each E/M unit will be more profitable. These economics have a direct impact on providers' prescribing behavior. That is, providers are less likely to prescribe a drug that imposes an undue burden on support staff as those tasks would mean a decrease in profitability because a provider would either have to hire more staff or see fewer patients throughout their day. Conversely, a provider is much more likely to prescribe a drug if it can be prescribed with little or no administrative burden. Thus, the provider's relative cost and burden in prescribing one company's drug when compared to another company's drug can influence which drug a provider will recommend to a patient. These economic truisms certainly are not lost on pharmaceutical manufacturers like AbbVie.

51.     Indeed, the provision of RS services provides an easy solution for providers and serves as an easy means for pharmaceutical companies to induce providers to prescribe their drugs. Here, AbbVie developed a concierge of RS services that are marketed along with its drug products in order to increase the likelihood that prescribers – such as primary care providers, rheumatologists, and gastroenterologists – would prescribe their drugs.  By giving a provider RS services, AbbVie's management intended this service to be a tangible "in kind" benefit which would result in reducing, and in some instances eliminating entirely, a provider's administrative costs related to prescribing AbbVie drugs.  AbbVie's goal in doing so was to induce providers to choose AbbVie drugs over a competitor's drugs.

52.     In 2003, the OIG ("the HHS Office of Inspector General") undertook a comprehensive analysis of such practices.  The OIG published its finding in a document entitled "Compliance Program Guidance for Pharmaceutical Manufacturers" ("CPG").[6]  The CPG sets forth clear and detailed rules, many of which are applicable to AbbVie's conduct in this matter. Given its depth and complexity, a brief outline of the CPG follows.

53.     In Section II (B)(2)(b), entitled "Kickbacks and Other Illegal Remuneration," the OIG analyzes the AKS and the "constraints it places on the marketing and promotion of [drugs] reimbursable by the federal health care programs . . . ."  For ease of illustration in this memo, this section of the CPG will be referred to as the "AKS section."  In subsection B of the AKS section, OIG identifies "Key Areas of Potential Risk" of AKS scrutiny.  This subsection will be referred to as the "Potential Risk section."  Within the Potential Risk section, OIG analyzes the potential risks

---

[6]     68 Fed. Reg. 23731, (May 5, 2003) (noting that the "guidance provides the *OIG's views on the fundamental elements* of pharmaceutical manufacturer compliance programs and principles . . .") (emphasis added).  Notably, this guidance has not been amended or rescinded since its 2003 publishing.

involved with two separate groups of "relationship" partners, each of whom transact business with the pharmaceutical industry.

54.     The first group analyzed in this section by the OIG is "***Purchasers and their Agents***" -- the transactional partners that purchase drugs from the pharmaceutical manufacturers. This group includes hospitals, nursing homes, pharmacies, "***some physicians***" and indirect purchasers (*e.g.*, health plans)(emphasis added).[7]  Importantly, the term "some physicians" in this section refers to providers who prescribe Part B (i.e., "buy and bill" drugs).  Unlike the office-based providers in this matter who prescribe AbbVie's Part D drugs (*e.g.*, Humira), a Part B provider purchases drugs directly from the specialty pharmacy.  Once purchased, a Part B provider first administers the drug to patients and then submits a bill that includes reimbursement for the drug and its administration to the patient.

55.     For these Part B providers, the OIG authorizes a pharmaceutical company to provide limited RS services.  The reason that RS services for "buy and bill" Part B providers and other purchasers is permitted is that this group must make an initial financial investment in acquiring the drug.  OIG recognizes that this group may be reluctant to make this initial financial investment in an expensive drug for fear that it would not be able to recoup the initial outlay in the reimbursement process.  Because of these financial risks faced by Part B providers, the OIG decided to strike a balance between that risk, and the risk of unlawful inducements, and thus specifically permitted limited support services that had no independent value to "buy and bill" providers and other purchasers.  Thus, if AbbVie were only offering limited RS services to "buy and bill" Part B providers, the conduct would likely be less facially problematic.

56.     However, AbbVie, for the last decade, has been offering RS services not to Part B

---

[7]     CPG Section IIB(2)(b)(B)(1)(a).

"buy and bill" providers, but instead to Part D providers.  In the CPG, the OIG addresses these Part D providers in a separate subsection of the Potential Risk section.  These providers are analyzed in the subsection entitled "*Physicians and Other Persons and Entities in a Position to Make or Influence Referrals*."[8]  This group is comprised of "persons or entities in a position to refer, order, or prescribe—or influence the referral, ordering, or prescribing of—the manufacturers' [drugs]."  Here, this group includes the Part D providers who "recommend" (i.e., prescribe) drugs.  Unlike in the case of the Part B providers, the OIG specifically chose *not* to permit RS services for these Part D providers.  Instead, the OIG urges particularly close scrutiny stating, in relevant part:

> Any time a pharmaceutical manufacturer provides anything of value to a physician who might prescribe the manufacturer's product, the manufacturer should examine whether it is providing a valuable tangible benefit to the physician with the intent to induce or reward referrals.  For example, if goods or services provided by the manufacturer eliminate an expense that the physician would have otherwise incurred (i.e., have independent value to the physician), or if items or services are sold to a physician at less than their fair market value, the arrangement may be problematic if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer.

*Id.*[9]

57.    The OIG's CPG prohibition on RS services is similarly reflected in the Pharmaceutical Research and Manufacturers of America (PhRMA) Code on Interactions with Healthcare Professionals ("PhRMA Code") which specifically prohibits subsidizing and/or supporting RS services for Part D providers in Section 13 entitled "Independence and Decision

---

[8]     CPG Section IIB(2)(b)(B)(1)(b), 68 Fed. Reg. 23731, 23734 (May 5, 2003).

[9]     That this guidance predates Medicare Part D's 2003 enactment and 2006 effective dates is of no moment, here, as the OIG explicitly provided this guidance "in its effort to engage the health care community in preventing and reducing fraud and abuse in health care programs," not just in *parts of* programs, such as Medicare (*e.g.*, Medicare Part B).  Moreover, the OIG clearly contemplated the potential for the implementation of the Part D benefit when drafting the CPG.

Making" as follows:

> No ... subsidies, support, ... or educational or practice related items should be provided or offered to a healthcare professional in exchange for prescribing products or for a commitment to continue prescribing products. Nothing should be offered or provided in a manner or on conditions that would interfere with the independence of a healthcare professional's prescribing practices.

58.     Thus, while pharmaceutical manufacturers have some limited leeway in their relationship with purchasers, including Part B providers, the industry does ***not*** have the same leeway in its relationships with office-based Part D providers who are in a position to "recommend" drugs to patients.   However, and in any case, Defendants' provision of tangible benefits to providers exceeded what little was allowed under Part B, and utterly violated the AKS by providing tangible benefits to office-based Part D providers in order to induce recommendations of AbbVie's drugs.

59.     For the last half a decade, AbbVie Sales Representatives have essentially pitched Part D providers by offering the services and resources of a full reimbursement support team to manage the process associated with prescribing the drug in exchange for prescriptions, and represented that they will save providers the cost and expenses normally associated with managing a patient's prescription and make the provider's practice more profitable.

60.     AbbVie's RS services have been a powerful tool in the hands of AbbVie's Sales Representatives and has been used to influence providers to recommend AbbVie drugs.

61.     Ms. Miller, who was employed by Pharmacy Solutions as a Trainer, also worked with the AbbVie drug rep trainers whose role was to train AbbVie Sales Representatives in the RS services sales pitch.  Ms. Miller's role was to ensure that these drug rep trainers were fully versed in the mechanics of the RS services that Pharmacy Solutions could perform.  That is, in order for the AbbVie Sales Representatives to gain maximum leverage from the RS services portfolio, the

Sales Representatives needed to understand what RS services could be offered to a provider, and how each could be of value to that provider. These drug rep trainers made it clear to Ms. Miller that RS services were an important influence strategy and sales tool that AbbVie's Sales Representatives could use (and which they did use) to induce referrals from providers.

62.    According to Ms. Miller, the scheme described herein was extremely successful. In her estimate, approximately 50% of all Humira dispensed in the United States and covered by Medicare was dispensed through providers enrolled in Defendants' RS services program. Indeed, according to Ms. Miller, the provision of RS services by AbbVie was a material factor in a provider's decision to prescribe Humira instead of another, equivalent, drug – in her words, providers "loved" the service and prescribed Humira preferentially as a result of the time and money it saved them. From a purely financial standpoint, the benefits to AbbVie from offering providers its RS services was massive: in just 2012, for example, AbbVie sold $4.3 billion worth of Humira in the United States. And as the years have passed, AbbVie's sales have continued to grow – clearing $14 billion worldwide in 2015, and are forecasted to hit $20 billion by 2020.

63.    All of the CWs confirm that RS services are, and have always been, very much a part of the AbbVie Sales Representatives' collective sales pitch. For example, one of AbbVie's sales account executives and senior territory managers for AbbVie from 2005 through 2007 ("Territory Manager #1") was on the sales team that launched Humira. According to Territory Manager #1, providers were initially reluctant to prescribe Humira because of the "hassle" the providers were required to go through in order to get the drug authorized and reimbursed. Further, she stated that Humira was priced exponentially higher than its competitors, many of which were generics that were priced at a fraction of Humira's cost. As such, AbbVie's launch strategy recognized that selling Humira solely on the efficacy and patient outcomes would be a challenge.

AbbVie sought to offer more to overcome this barrier to entry. Thus, as part of the launch strategy, Territory Manager #1 stated that the value proposition offered to providers combined the drug's efficacy with RS services and nurse education services (discussed below). Territory Manager #1 states that AbbVie Sales Representatives were trained to always "pitch," message, and offer RS services to providers in order to induce drug sales. According to all CWs, this pitch resonated with providers because they knew that by recommending Humira, the administrative costs associated with that prescription would shift from them to Pharmacy Solutions.

64.     Territory Manager #1 further stated that there was a collaborative approach between the Sales Representatives and the RS team. That is, rather than promoting and marketing its drugs solely on patient outcomes and efficacy, AbbVie Sales Representatives would also explain and detail the RS services that could be offered. AbbVie Sales Representatives routinely introduced the provider's key staff members to the RS services team with whom they would interact when an AbbVie prescription was written. Further, the RS services teams were expected to establish a close working relationship with these key staff members and assist each in every possible manner to reduce and/or eliminate the administrative costs associated with the AbbVie prescription. AbbVie management, through words, deeds and training made clear to all CWs that the ultimate goal was to make RS services a powerful incentive for providers to induce recommendations of AbbVie drugs to patients. AbbVie knew that these RS services would present a tangible value to providers. When that offer was accepted, the provider received the benefits of the RS services without actually having to pay for those services.

65.     "Sales Representative #1," one of AbbVie's Humira Sales Representatives for Dallas, Texas, and employed from August, 2009 through July, 2015 to sell Humira, confirms virtually everything Ms. Miller (and the other former employees of Defendants) states. First, Sales

Representative #1 states that the goal of the RS services program offered by Defendants was to get providers to "buy in" to the program so that AbbVie could sell Humira, and he felt that the RS services program was very effective at achieving this end. Indeed, the program was so effective that Sales Representative #1 stated that he and his district in Texas, "led the nation" in terms of getting providers to write Humira prescriptions. Second, when questioned, Sales Representative #1 confirmed that the RS services represented a substantial and tangible benefit that AbbVie gave to providers. In his words, these services were valuable to providers because if AbbVie was not providing RS services, then the provider's office staff would have to do so and that providers are well-aware that their "time is money." Third, Sales Representative #1 stated that AbbVie implemented the RS program to induce providers to write prescriptions for Humira and not competitor drugs. That is, he stated that: (i) pharmaceutical companies see a positive net impact in new prescriptions and refills when they use pharmacy support services; (ii) providers who receive RS from pharmaceutical companies are more likely to prescribe that company's drug over that of a competitor that does not provide RS; and (iii) the provider preference for RS services is so strong that *nine out of ten times* a provider, when faced with two similar drugs, will choose to write a prescription for the drug sold by a company that provides him or her with RS services over the one that does not. The provider preference for RS services was strong, Sales Representative #1 stated, that "99.99%" of providers that wrote Humira prescriptions at all enrolled and participated in AbbVie's RS program.

66.     Indeed, according to Sales Representative #1, the economic benefits of giving providers RS services was of substantial economic benefit – radically increased prescriptions for the AbbVie's drugs – justifying even the massive costs to AbbVie involved in implementing and running its RS services program.

### 1.      **Pharmacy Solutions Reimbursement Support Services Team**

67.     Once an AbbVie drug rep "sold" the free RS services to a provider, that provider would then work directly with the Pharmacy Solutions RS team each time an AbbVie prescription was written and sought to be filled.

68.     Here, the structure, function and services of Pharmacy Solutions are detailed below. However, it is important to note the following: Pharmacy Solutions is a licensed pharmacy; not unlike a CVS or a Rite Aid.  If a provider's patient wanted to have a drug filled at a CVS, it would be highly irregular, if not illegal, for Rite Aid to call the patient's insurance carrier and undertake the steps to get the drug filled by the patient at CVS.  Yet, as is detailed below, this highly irregular undertaking occurs daily with Pharmacy Solutions.  In fact, although Pharmacy Solutions is a pharmacy, the confidential witnesses state that it is rarely in a patient insurance network and therefore most patients cannot have their prescription filled by Pharmacy Solutions. Nevertheless, Pharmacy Solutions is undertaking the steps to get the drug filled even though it will be filled at a different pharmacy.

69.     The RS teams are broken down into three distinct groups, but they work in coordination and collaboration to service providers who write AbbVie's products.

70.     The first group is called the Customer Service Representatives ("CSR").  There are approximately 20 full time CSR's employed by Pharmacy Solutions.  CSRs are paid approximately $54,000 a year in salary.  Each CSR's area of responsibility is broken down by geographical region and each acts as a single point of contact for the providers in their territory.  That is, once a CSR is assigned a specific provider, all contact between that provider and Pharmacy Solutions goes through that CSR.  Once assigned to a provider, the drug rep immediately introduces the CSR to the provider, and more importantly, to the key members of that provider's staff who are responsible

for managing patient prescriptions. The CSRs are taught relationship building skills targeted at those key staff members. CSRs call these key staff members by first name and learn their personal prescribing preferences. CSRs are taught the importance of follow up, courtesy, and promptness. The CSR's ultimate goal is to function as an extension of the provider's staff in order to manage any and all reimbursement issues regarding AbbVie's products.

71.     The second group is the Patient Care Coordinators ("PCC"). This team consists of licensed pharmacy technicians. The PCC's role is to work directly with patients and assist each with any issues regarding coverage and/or affordability issues. There are approximately 50 PCCs employed by Pharmacy Solutions. PCCs earn between $45,000 and $50,000 per year. As with the CSRs, this group is taught to work closely with a provider's patient and develop a positive relationship. The PCCs function to help manage a provider's patients and answer any questions they may have regarding coverage and the medication. The services performed by PCCs have a tangible benefit to providers who prescribe AbbVie products because providers would no longer have to field phone calls and questions from patients regarding AbbVie's drugs and coverage. The PCCs greatly reduce, and in some cases eliminate, the administrative cost that a provider would otherwise incur from prescribing a drug.

72.     The third group is the Benefits Verification ("BV") specialists. They are referred to as "coverage detectives." The BV specialists' job is to work with both the provider's CSR and the patients PCC, and, on occasion, to work directly with patients regarding coverage determinations, co-pays, etc. Pharmacy Solutions employs about 65 BV specialists. A BV specialist earns between $35,000 and $47,850 a year. Pharmacy Solutions extensively trains these BV specialists to be experts in all areas of insurance coverages with respect to AbbVie's products. Like the PCC and the CSRs, the BV specialist provides a tangible benefit to providers who

prescribe AbbVie drugs.  Those providers no longer have to employ a staff member of their own to learn and navigate the complex coverage rules from hundreds of insurance plans.

73.     These three Pharmacy Solutions teams work in concert to provide the following services to providers: 1) Benefit verification services; 2) Prior Authorization services; and, 3) Patient Financial Assistance Support.  Each of these services is discussed in turn below.

74.     Whenever a specialty drug prescription is written, various steps must be taken to get the drug approved and filled.  The first step is called a benefit verification.  Each day, Pharmacy Solutions receives electronic and fax prescription requests from providers.  Each request is immediately forwarded to the BV specialist who will perform the benefit verification process for the provider.  First, a BV specialist verifies the patients' primary and secondary insurance benefits (i.e., private insurance, Medicare, TRICARE, and/or Medicaid).  Next, the BV specialist directly contacts the patient's health insurance carrier and verifies the nature and extent of the patient's coverage.

75.     According to a benefits verification analyst at Pharmacy Solutions ("Benefits Verification Analyst #1), "the process of getting Humira covered can be very complex and time consuming.  Most claims require a great deal of time to get approved."  A patient assistant coordinator at AbbVie ("Patient Assistant Coordinator #1"), echoed these statements and specifically noted that performing a benefit verification requires "a lot of skill and knowledge." Further, Benefits Verification Analyst #1 stressed that having someone capable of performing a benefit verification efficiently is a significant resource to providers.  According to Benefits Verification Analyst #1 it can take up to 90 minutes to do a benefit verification for Humira approval, with half of this time spent "waiting to get a live person from the patient's insurance on the phone."  A benefit verification is particularly cumbersome and time consuming for Medicare

patients given the complexity of Part D plans that have four coverage phases: Deductible phase – where a patient pays 100% for drug costs until the deductible amount; Initial coverage limit phase – where a patient would pay a percentage of the cost depending on the carrier and the drug's formulary position; Coverage gap, or "donut hole" phase – where patients would pay 45% of the cost for brand-name drugs and 65% of the cost for generic drugs in 2015; and, catastrophic coverage phase – where a patient pays either 5% of the covered drug cost or $2.65 for generics and $6.60 for brand name drugs in 2015.

76.     Setting aside the impropriety of providing this high-value service to providers in exchange for prescription recommendations, Pharmacy Solutions often flouts Medicare regulations just to get its end of the *quid pro quo* accomplished. For example, Pharmacy Solutions improperly purports to be a patient's "appointed representative" when conducting its RS services for providers. CMS refers to the reimbursement and appeal process as a "coverage determination." CMS sets forth clear rules which establish the rights and responsibilities of Medicare beneficiaries and the Part D carriers who administer the patient's drug benefit for purposes of coverage determinations. Broadly speaking, patients have the right to prompt coverage determinations, the right to seek a reconsideration of an adverse coverage determination and the right to appeal and adverse coverage determinations.   The coverage determination requires contacting the patient's Part D carrier and conveying information about the patient and the need for the medication. Because of privacy and HIPAA concerns, CMS only permits three parties to seek a coverage determination: 1) The patient; 2) the prescribing physician; and 3) the patient's appointed representative.  Medicare regulations define "appointed representative" as follows:

> Appointed representative means an individual either appointed by an enrollee or authorized under State or other applicable law to act on behalf of the enrollee in filing a grievance, obtaining a coverage determination, or in dealing with any of the levels of the appeals process. Unless otherwise stated in this subpart, the appointed

representative has all of the rights and responsibilities of an enrollee in filing a grievance, obtaining a coverage determination, or in dealing with any of the levels of the appeals process, subject to the rules described in part 422, subpart M of this chapter.

42 CFR § 423.560.

77.     Appointed representatives for the exceptions and appeals process traditionally include retail pharmacists, nursing facility staff members or others as delegated by the beneficiary. Unlike the restrictions that apply to representation for enrollment decisions where the authorization must be to someone who has delegated decisional authority under State law, appointed representative delegations are relatively liberal.  The rationale is that there is no financial self-interest in representing an enrollee in exceptions and appeals process and there are prohibitions against charging beneficiaries for this service.

78.     In this matter, the party seeking the benefit verification is Pharmacy Solutions—not the patient, physician or appointed representative—in violation of the letter and spirit of the Medicare regulations.  Unlike physicians, independent pharmacists, nursing facility staff members and the like, none of whom have any self-interest getting a Part D program enrollee on an AbbVie drug, Pharmacy Solutions has a direct interest in doing so as it is one in the same as AbbVie.  In light of this this total self-interest, Pharmacy Solutions is more a representative of AbbVie than the patient/enrollee when the exact opposite should be the case.

79.     Indeed, even the language of Pharmacy Solutions' authorization form highlights the company's fast and loose interpretation of the regulations, using "agent" instead of (and because it cannot meet the definition of) "appointed representative."  It states:

> I authorize Pharmacy Solutions and its employees to serve as my agent for the sole purpose of obtaining patient benefit information and the necessary prior authorization forms when dealing with Health Plans and Pharmacy Benefits Managers (PBMs), if the plan or PBM requires such authorization.

80.     As such, this language suggests that Pharmacy Solutions purports to be acting as the provider's "agent" when calling the patient's Part D carrier and speaking to a representative in order to verify a patient's coverage.  However, while CMS has authorized patients to appoint an agent on his/her behalf, CMS chose *not* to grant that same authority to providers.  Yet, for tens if not hundreds of thousands of Humira Part D patients, each time a patient's benefits have been verified, the verification was undertaken by Pharmacy Solutions; an entity that is not authorized by CMS to perform this function and which creates a substantial conflict of interest.  Further, the benefit verification process may also involve an analysis of a patient's entire prescription benefit details including the patient's current medications, which raises serious HIPAA concerns.

81.     Finally, in addition to the initial benefit verification, there are numerous other actual and potential interactions between a patient's Part D carrier representative and Pharmacy Solutions which are not authorized by CMS.  These are spelled out in detail in the CMS guidelines, but generally include interactions regarding adverse coverage determination, prior authorizations, and the right to appeal any adverse coverage determinations.  Ordinarily, these interactions are between a provider and/or pharmacy that is in the Part D carrier's network and under a contract with the Part D carrier.  These contracts necessarily impose obligations on the provider/pharmacy to act truthfully, honestly and ethically in each and every interaction between it and the Part D carrier.  These contracts also undoubtedly have penalties and consequences if these obligations are not met by the provider/pharmacy.  Finally, these contracts undoubtedly require a pharmacy/provider to act in the best interest of the patients.

82.     Here, however, the entity which is interacting with the carrier is not contractually, ethically or duty bound to anyone.  Rather, Pharmacy Solutions' only fealty is to AbbVie.  And its only goal is to ensure that any AbbVie prescription is approved.

83.     AbbVie, through Pharmacy Solutions, also "tricks" Medicare Part D carriers to obtain patients' drug insurance coverage information.  This behavior has been confirmed by both Benefits Verification Analyst #1 and a counsellor at AbbVie's Patient Assistance Program ("Patient Assistance Counsellor #1).  This ruse occurs when a provider has not yet received the patient's consent to start the drug, but instead the patient and/or the provider have reservations about the out-of-pocket cost of the drug. As set forth above, for most patients, Pharmacy Solutions is *not* the patient's in-network pharmacy.  As such, another specialty pharmacy will eventually fill the patient's prescription; not Pharmacy Solutions.  However, when the Pharmacy Solutions BV specialist calls the patient's Part D sponsor he/she acts *as though* Pharmacy Solutions is going to fill the drug, and under this ruse, requests that the patient's carrier submit a test claim for reimbursement through the coverage system.  The result of this test claim is available through a web portal that both the carrier and BV specialist can access.  Thus, once the claim is run through the system, the Pharmacy Solutions BV specialist can immediately see the amount of the reimbursement for the drug and then asks the Part D carrier's representative questions about the patient's coverage vis-a-vis the "donut hole."  Most times, the carrier's representatives comply with the request. However, both Benefits Verification Analyst #1 and Patient Assistance Counsellor #1 report instances when a savvy carrier's representative will object to this request because Pharmacy Solutions is not going to fill the drug.  Stated differently, the Part D carrier rightfully refuses to give confidential information about one of its members because the pharmacy making the request is not the patient's pharmacy.  This conduct raises ethical, HIPAA and transparency issues that demonstrate an inference that Defendants are aware of the impropriety of their conduct.

84.     Next, once the coverage information is obtained, the BV specialist creates a detailed

benefit verification report and transmits the coverage information to both the provider and the patient. This report contains detailed information, such as what drug coverage benefits are available, and includes information regarding where the patient stands relative to the "donut hole." Without this benefit verification service, providers would be forced to dedicate staff time and resources to first analyze each patient's coverage profile and then to call the patients' insurance plans to determine whether the drug was covered and to what extent. As stated above, this process is particularly time consuming for specialty drugs like Humira. Alternatively, if the provider chose to outsource this BV service, providers would be forced to independently contract with a private vendor and pay a transactional fee each time a patient's benefits were verified. This fee ranges from $50 to $80 per benefit verification. Instead, AbbVie Sales Representatives offer providers a means to "outsource" the benefit verification without any direct or indirect cost to the provider – but *only if* the provider prescribes an AbbVie drug.

### 2.   **Prior Authorization Services**

85.     The next type of service given by AbbVie through Pharmacy Solutions is prior authorization services.  This service is particularly important to providers, particularly with drugs such as Humira, because Humira, as an expensive specialty drug, requires a prior authorization from the patient's insurance carrier.  A prior authorization is a requirement by an insurance carrier that a patient's provider obtain approval from the patient's health insurance plan before prescribing certain medications.  Further, if a medication receives a prior authorization, that authorization may only be valid for a limited time, such as for one year, and sometimes for only a month.  After that, the provider must start the prior authorization process over again.  The prior authorization process is particularly cumbersome and is widely reviled by providers.  The paperwork and time required for a prior authorization may, in many cases, result in a provider choosing to write a cheaper competitor medication that does not require a prior authorization.  Part D carriers use the prior authorization process in order to contain costs associated with expensive medications.  That is, if a provider wants to recommend an expensive drug like Humira, Part D carriers require that provider to take the time and effort to "make the case" for prescribing the drug over a cheaper drug.

86.     A prior authorization requires direct input from the provider regarding a patient's medical necessity for a drug and specialized knowledge from the provider's staff about each carrier's unique prior authorization criteria.  A prior authorization takes time and experienced personnel.   The prior authorization service offered by AbbVie starts with analysis of the comprehensive prior authorization criteria for a patient.   Next, Pharmacy Solutions offers providers a series of form letters and templates that are tailored to the disease states which are treated with AbbVie products.  As Pharmacy Solutions' BV specialists have been trained as experts

in coverage issues, including prior authorizations, the BV specialist will help the providers with the specific language and "buzz words" that are known to most likely result in coverage for the provider's patients. These buzz words ordinarily relate to the patient's symptoms, co-morbitities, medical condition, and the anticipated outcome if the patient received insurance coverage for the drug. Patient Assistance Counsellor #1 and an Insurance Analyst and Prior Authorization Representative at Pharmacy Solutions ("Prior Authorization Representative #1") both noted that as part of their daily activities, they would routinely assist providers with prior authorization templates and then supply the subsequent form letters to the providers.

87. Importantly, providers are not permitted to charge a fee to patients for obtaining a prior authorization because the payer-provider contracts with Medicare, Medicaid, and private insurances prohibit charging a fee for this service. This prohibition makes sense because, as is detailed above, the provider is already receiving a payment for this service bundled into the provider's E/M unit payment.

88. Absent Pharmacy Solutions' prior authorization services, a provider would be required to hire staff with prior authorization expertise and spend time and money helping patients through the Humira prior authorization process. Alternatively, if the provider chose to outsource this prior authorization service, he/she would be forced to independently contract with a vendor and pay a transactional fee each time a patient needed a prior authorization. This fee ranges from $80 to $100 per prior authorization. Instead, AbbVie Sales Representatives offer providers a means to "outsource" the prior authorization without any cost to the provider – but only if the provider prescribes an AbbVie drug.

## COUNT I
### (False Claims Act, 31 U.S.C. § 3729 *et seq.*)

89. Relators repeat each allegation in each of the proceeding paragraphs of this

Complaint with the same force and effect as if set forth herein.

90.     As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare, Medicaid, and TRICARE by submitting fraudulent bills to the Government (and/or through its conduct in causing others to submit fraudulent bills to the Government) as a result of kickbacks provided to referring physicians.

91.     By virtue of the acts described above, Defendants have violated:

(1)     31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

(2)     31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3)     31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

92.     To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relators reallege that Defendants knowingly violated 31 U.S.C. §§ 3729(a)(1)-(2) and (a)(7) prior to amendment, by engaging in the above-described conduct.

93.     By reason of the foregoing, the United States has suffered actual damages and is entitle to recover treble damages plus a civil monetary penalty for each false claim.

WHEREFORE, Relators pray that the Court enter judgment against Defendants as follows:

(1)     that the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, provides;

(2)     that civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the United States and/or its grantees, and for each false record or statement that Defendants made, used, or caused to be made or used that was material to a false or fraudulent claim;

(3)     that attorneys' fees, costs, and expenses that Relators necessarily incurred in bringing and pressing this case be awarded;

(4)     that Relators be awarded the maximum amount allowed to them pursuant to the False Claims Act; and

(5)     that this Court order such other and further relief as it deems proper.

## COUNT II
### (California False Claims Act, Cal. Gov't Code § 12650 *et seq.*)

94.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

95.     This is a *qui tam* action brought by the Relators on behalf of the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12650 *et seq.*

96.     Cal. Gov't Code § 12651(a) provides liability for any person who:

(1)     knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof; a false claim for payment or approval;

(2)     knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

(3)     conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision;

(4)     is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and

fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

97.   Defendants violated Cal. Gov't Code § 12651(a) and knowingly caused false claims to be made, used and presented to the State of California by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government funded health care programs.

98.   The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' conduct, paid the claims submitted by health care providers and third party payers in connection therewith.

99.   Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of California in connection with Defendants' conduct. Compliance with applicable California statutes and regulations was also a condition of payment of claims submitted to the State of California.

100.   Had the State of California known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

101.   As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

102.   Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

103.    This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CALIFORNIA:

(1) Three times the amount of actual damages which the State of California has sustained as a result of Defendants' conduct;

(2) A civil penalty of up to $10,000 for each false claim which Defendants presented or caused to be presented to the State of California;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT III
**(Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*)**

104.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

105.    This is a *qui tam* action brought by the Relators on behalf of the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq.*

106.    Colorado's Medicaid False Claims Act, C.R.S.A. § 25.5-4-304 *et seq*., provides for liability for any person who:

(a) Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c) Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

(d) Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(e) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"; ...

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

107.    Defendants violated the Colorado Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Colorado by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

108.    The State of Colorado, by and through the Colorado Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

109.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Colorado in connection with Defendants' conduct. Compliance with applicable Colorado statutes and regulations was also a condition of payment of claims submitted to the State of Colorado.

110.    Had the State of Colorado known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

111.    As a result of Defendants' violations of the Colorado Medicaid False Claims Act, the State of Colorado has been damaged in an amount far in excess of millions of dollars exclusive of interest.

112.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Colorado Medicaid False Claims Act on behalf of themselves and the State of Colorado.

113.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Colorado in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

To the STATE OF COLORADO:

(1) Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Colorado;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Colorado Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT IV
### (Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*)

114.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

115.    This is a *qui tam* action brought by the Relators on behalf of the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.*

116.    Conn. Gen. Stat. § 17b-301b imposes liability as follows:

(a) No person shall:

(1) Knowingly present, or cause to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

(2) Knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

(3) Conspire to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

(4) Having possession, custody or control of property or money used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services, and intending to defraud the state or willfully to conceal the property, deliver or cause to be delivered less property than the amount for which the person receives a certificate or receipt;

(5) Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the state relative to a medical assistance program administered by the Department of Social Services and intending to defraud the state, make or deliver such document without completely knowing that the information on the document is true;

(6) Knowingly buy, or receive as a pledge of an obligation or debt, public property from an officer or employee of the state relative to a medical assistance program administered by the Department of Social Services, who lawfully may not sell or pledge the property; or

(7) Knowingly make, use or cause to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state under a medical assistance program administered by the Department of Social Services.

117.    Defendants violated the Connecticut False Claims Act and knowingly caused false claims to be made, used and presented to the State of Connecticut by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

118.    The State of Connecticut, by and through the Connecticut Medicaid program and

other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

119.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Connecticut in connection with Defendants' conduct. Compliance with applicable Connecticut statutes and regulations was also a condition of payment of claims submitted to the State of Connecticut.

120.    Had the State of Connecticut known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

121.    As a result of Defendants' violations of the Connecticut False Claims Act, the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

122.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Connecticut False Claims Act on behalf of themselves and the State of Connecticut.

123.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF CONNECTICUT:

    (1) Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Connecticut;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301a *et seq.* and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT V
### (Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*)

124.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

125.    This is a *qui tam* action brought by the Relators on behalf of the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*

126.    6 Del. C. § 1201(a) in pertinent part provides for liability for any person who:

    (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(c) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; or

(d) Conspires to commit one or more of the violations in this subsection (1).

127.    Defendants violated the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Delaware by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

128.    The State of Delaware, by and through the Delaware Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

129.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Delaware in connection with Defendants' conduct. Compliance with applicable Delaware statutes and regulations was also a condition of payment of claims submitted to the State of Delaware.

130.    Had the State of Delaware known that Defendants was violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

131.    As a result of Defendants' violations of the Delaware False Claims and Reporting

Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

132.    Relators are person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201 *et seq.*, on behalf of itself and the State of Delaware.

133.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF DELAWARE:

(1)    Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Delaware;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Delaware False Claims and Reporting Act, 6 Del. C. Ann. tit. 6 § 1201, and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT VI
### (Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*)

134.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

135.    This is a *qui tam* action brought by the Relators on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

136.    Fla. Stat. § 68.082(2) provides liability for any person who:

(a) knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;

(c) conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed-or paid.

137.    Defendants violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

138.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

139.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Florida in connection with Defendants' conduct. Compliance with applicable Florida statutes and regulations was also a condition of payment of claims submitted to the State of Florida.

140.    Had the State of Florida known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

141.    As a result of Defendants' violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

142.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of themselves and the State of Florida.

143.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF FLORIDA:

(1) Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Florida;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT VII
### (Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*)

144.   Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

145.   This is a *qui tam* action brought by the Relators on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168 *et seq.*

146.   The Georgia False Medicaid Claims Act imposes liability on any person who:

(1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

(4) Has possession, custody, or control of property or money used or to be used by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate of receipt;

(5) Being authorized to make or deliver a document certifying receipt of property used, or to be used, by the Georgia Medicaid program and, intending to defraud the Georgia Medicaid program, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Georgia Medicaid program

who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay, repay, or transmit money or property to the State of Georgia . . . .

147.    Defendants violated the Georgia False Medicaid Claims Act and knowingly caused false claims to be made, used and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

148.    The State of Georgia, by and through the Georgia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

149.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Georgia in connection with Defendants' conduct. Compliance with applicable Georgia statutes and regulations was also a condition of payment of claims submitted to the State of Georgia.

150.    Had the State of Georgia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

151.    As a result of Defendants' violations of the Georgia False Medicaid Claims Act, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive

of interest.

152.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Georgia False Medicaid Claims Act on behalf of themselves and the State of Georgia.

153.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF GEORGIA:

(1) Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Georgia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Georgia False Medicaid Claims Act, Ga. Code Ann., § 49-4-168, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT VIII
### (Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*)

154.    Relators reallege and incorporate by reference the prior paragraphs as though fully

set forth herein.

155.    This is a *qui tam* action brought by the Relators on behalf of the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*

156.    Section 661-21(a) provides liability for any person who-

(1)  Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3)  Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State; or

(4)  Conspires to commit any of the conduct described in this subsection,

157.    Defendants violated Haw. Rev. Stat. § 661-21(a) and knowingly caused false claims to be made, used and presented to the State of Hawaii by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

158.    The State of Hawaii, by and through the Hawaii Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

159.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Hawaii in connection with Defendants' conduct. Compliance with applicable Hawaii statutes and regulations was also a condition of payment of claims submitted to the State of Hawaii.

160.    Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

161.    As a result of Defendants' violations of Haw. Rev. Stat. § 661-21, the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

162.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Haw. Rev. Stat. § 661-21 on behalf of themselves and the State of Hawaii.

163.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF HAWAII:

    (1) Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Hawaii;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-21 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT IX
### (Illinois False Claims Act, 740 ILCS 175/1 *et seq.*)

164.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

165.    This is a *qui tam* action brought by the Relators on behalf of the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS 175/1 *et seq.*

166.    740 ILCS 175/3(a) provides liability for any person who:

(1) knowingly presents, or causes to be presented, to an officer or employee of the State a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

167.    Defendants violated 740 ILCS 175/3(a) and knowingly caused false claims to be made, used and presented to the State of Illinois by its deliberate and systematic violation of federal and state laws by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

168.    The State of Illinois, by and through the Illinois Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare

providers and third party payers in connection therewith.

169.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Illinois in connection with Defendants' conduct. Compliance with applicable Illinois statutes and regulations was also a condition of payment of claims submitted to the State of Illinois.

170.    Had the State of Illinois known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

171.    As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

172.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the State of Illinois.

173.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants

To the STATE OF ILLINOIS:

(1)    Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Illinois;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to 740 ILCS 175/4(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT X
**(Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.*)**

174.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

175.    This is a *qui tam* action brought by the Relators on behalf of the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Ind. Code 5-11-5.5 *et seq.*, which imposes liability on:

(b) A person who knowingly or intentionally:

(1) presents a false claim to the state for payment or approval;

(2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state;

(3) with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state;

(4) with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true;

(5) receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property;

(6) makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state;

(7) conspires with another person to perform an act described in subdivisions (1) through (6); or

(8) causes or induces another person to perform an act described in subdivisions (1) through (6)....

176.   Defendants violated Indiana False Claims Act and knowingly caused false claims to be made, used and presented to the State of Indiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

177.   The State of Indiana, by and through the Indiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

178.   Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Indiana in connection with Defendants' conduct. Compliance with applicable Indiana statutes and regulations was also a condition of payment of claims submitted to the State of Indiana.

179.   Had the State of Indiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were

premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

180. As a result of Defendants' violations of Indiana's False Claims Act, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

181. Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Ind. Code § 5-11-5.5 *et seq.* on behalf of themselves and the State of Indiana.

182. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF INDIANA:

    (1) Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Ind. Code § 5-11-5.5 *et seq.* and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XI
### (Iowa False Claims Law, I.C.A. § 685.1 *et seq.*)

183.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

184.    This is a *qui tam* action brought by the Relators on behalf of the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Law, I.C.A. § 685.1 *et seq.*

185.    Iowa False Claims Law, I.C.A. § 685.2, in pertinent part provides for liability for any person who:

> (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.
>
> (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.
>
> (c) Conspires to commit a violation of paragraph "a", "b", "d", "e", "f", or "g".

186.    Defendants violated the Iowa False Claims Law, I.C.A. § 685.1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of Iowa by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

187.    The State of Iowa, by and through the Iowa Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

188.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Iowa in connection with Defendants' conduct. Compliance with

applicable Iowa statutes and regulations was also a condition of payment of claims submitted to the State of Iowa.

189.    Had the State of Iowa known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

190.    As a result of Defendants' violations of the Iowa False Claims Law, I.C.A. § 685.1 *et seq.*, the State of Iowa has been damaged in an amount far in excess of millions of dollars exclusive of interest.

191.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.*, on behalf of themselves and the State of Iowa.

192.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF IOWA:

(1) Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Iowa;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Iowa False Claims Law, I.C.A. § 685.1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XII
**(Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*)**

193.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

194.    This is a *qui tam* action brought by the Relators on behalf of the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 437.1 *et seq.*

195.    La. Rev. Stat. Ann. § 438.3 provides-

(A) No person shall knowingly present or cause to be presented a false or fraudulent claim;

(B) No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;

(C) No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

196.    Defendants violated La. Rev. Stat. Ann. §438.3 and knowingly caused false claims to be made, used and presented to the State of Louisiana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare

programs.

197.    The State of Louisiana, by and through the Louisiana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

198.    Compliance with the Anti-Kickback Statute applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Louisiana in connection with Defendants' conduct.  Compliance with applicable Louisiana statutes and regulations was also a condition of payment of claims submitted to the State of Louisiana.

199.    Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

200.    As a result of Defendants' violations of La. Rev. Stat. Ann. § 438.3, the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

201.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to La. Rev. Stat. Ann. §439.1(A) on behalf of itself and the State of Louisiana.

202.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF LOUISIANA:

(1)     Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' conduct;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To Relators:

(1)     The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XIII
**(Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*)**

203.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

204.    This is a *qui tam* action brought by the Relators on behalf of the State of Maryland to recover treble damages and civil penalties under the Maryland False Claims Act, Md. Code Ann. Health - Gen., § 2-601 *et seq.*

205.    Section 2-602 of Maryland's False Claims Act imposes liability as follows:

(a) A person may not:

(1) Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;

(3) Conspire to commit a violation under this subtitle;

(4) Have possession, custody, or control of money or other property used by or on behalf of the State under a State health plan or a State health program and knowingly deliver or cause to be delivered to the State less than all of that money or other property;

(5) (i) Be authorized to make or deliver a receipt or other document certifying receipt of money or other property used or to be used by the State under a State health plan or a State health program; and (ii) Intending to defraud the State or the Department, make or deliver a receipt or document knowing that the information contained in the receipt or document is not true;

(6) Knowingly buy or receive as a pledge of an obligation or debt publicly owned property from an officer, employee, or agent of a State health plan or a State health program who lawfully may not sell or pledge the property;

(7) Knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or other property to the State;

(8) Knowingly conceal, or knowingly and improperly avoid or decrease, an obligation to pay or transmit money or other property to the State; or

(9) Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

206.    Defendants violated the Maryland False Claims Act, and knowingly caused false claims to be made, used and presented to the State of Maryland by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

207.     The State of Maryland, by and through the Maryland Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

208.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Maryland in connection with Defendants' conduct.  Compliance with applicable Maryland statutes and regulations was also a condition of payment of claims submitted to the State of Maryland.

209.     Had the State of Maryland known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

210.     As a result of Defendants' violations of the Maryland False Claims Act, the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

211.     Relators are persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Maryland False Claims Act on behalf of itself and the State of Maryland.

212.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendant:

To the STATE OF MARYLAND:

     (1)    Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendants' conduct;

     (2)    A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Maryland;

     (3)    Prejudgment interest; and

     (4)    All costs incurred in bringing this action.

To Relators:

     (1)    The maximum amount allowed pursuant to Maryland False Claims Act and/or any other applicable provision of law;

     (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

     (3)    An award of reasonable attorneys' fees and costs; and

     (4)    Such further relief as this Court deems equitable and just.

## COUNT XIV
**(Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*)**

213.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

214.    This is a *qui tam* action brought by the Relators on behalf of the State of Michigan to recover treble damages and civil penalties under Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*, which provides in pertinent part as follows:

    Sec. 3. (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits;

    (2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit....

215.     Defendants violated Michigan law and knowingly caused false claims to be made, used and presented to the State of Michigan by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

216.     The State of Michigan, by and through the Michigan Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

217.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Michigan in connection with Defendants' conduct. Compliance with applicable Michigan statutes and regulations was also a condition of payment of claims submitted to the State of Michigan.

218.     Had the State of Michigan known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

219.     As a result of Defendants' violations of the Medicaid False Claims Act, the State of Michigan has been damaged in an amount far in excess of millions of dollars exclusive of interest.

220.     Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Medicaid False Claims Act on behalf of themselves and the State of Michigan.

221.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MICHIGAN:

(1) Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Michigan;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to the Medicaid False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XV
### (Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*)

222.   Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

223.   This is a *qui tam* action brought by the Relators on behalf of the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, M.S.A. § 15C.01 *et seq.*

224.    Minnesota False Claims Act, M.S.A. § 15C.02, provides for liability for any person who:

(1)   knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval;

(2)   knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision;

(3)   knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or used a false record or statement to obtain payment or approval of a false or fraudulent claim;

(4)   has possession, custody, or control of public property or money used, or to be used, by the state or a political subdivision and knowingly delivers or causes to be delivered to the state or a political subdivision less money or property than the amount for which the person receives a receipt;

(5)   is authorized to prepare or deliver a receipt for money or property used, or to be used, by the state or a political subdivision and knowingly prepares or delivers a receipt that falsely represents the money or property;

(6)   knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state or a political subdivision who lawfully may not sell or pledge the property; or

(7)   knowingly makes or uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state or a political subdivision.

225.    Defendants violated the Minnesota False Claims Act and knowingly caused false claims to be made, used and presented to the State of Minnesota by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

226. The State of Minnesota, by and through the Minnesota Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

227. Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Minnesota in connection with Defendants' conduct. Compliance with applicable Minnesota statutes and regulations was also a condition of payment of claims submitted to the State of Minnesota.

228. Had the State of Minnesota known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

229. As a result of Defendants' violations of the Minnesota False Claims Act, the State of Minnesota has been damaged in an amount far in excess of millions of dollars exclusive of interest.

230. Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Minnesota False Claims Act on behalf of themselves and the State of Minnesota.

231. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Minnesota in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

To the STATE OF MINNESOTA:

    (1) Three times the amount of actual damages which the State of Minnesota has sustained as a result of Defendants' conduct;

    (2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Minnesota;

    (3) Prejudgment interest; and

    (4) All costs incurred in bringing this action.

To Relators:

    (1) The maximum amount allowed pursuant to Minnesota False Claims Act and/or any other applicable provision of law;

    (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3) An award of reasonable attorneys' fees and costs; and

    (4) Such further relief as this Court deems equitable and just.

## COUNT XVI
### (Montana False Claims Act, MCA § 17-8-401 *et seq.*)

232.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

233.    This is a *qui tam* action brought by the Relators on behalf of the State of Montana to recover treble damages and civil penalties under the Montana False Claims Act, MCA § 17-8-401 *et seq.*

234.    Montana's False Claims Act, MCA § 17-8-403, provides for liability for any person who:

    (a) knowingly presents or causes to be presented to an officer or employee of the governmental entity a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the governmental entity;

(c) conspires to defraud the governmental entity by getting a false or fraudulent claim allowed or paid by the governmental entity;

(d) has possession, custody, or control of public property or money used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, delivers or causes to be delivered less property or money than the amount for which the person receives a certificate or receipt;

(e) is authorized to make or deliver a document certifying receipt of property used or to be used by the governmental entity and, with the intent to defraud the governmental entity or to willfully conceal the property, makes or delivers a receipt without knowing that the information on the receipt is true;

(f) knowingly buys or receives as a pledge of an obligation or debt public property of the governmental entity from any person who may not lawfully sell or pledge the property;

(g) knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the governmental entity or its contractors; or

(h) as a beneficiary of an inadvertent submission of a false or fraudulent claim to the governmental entity, subsequently discovers the falsity of the claim or that the claim is fraudulent and fails to disclose the false or fraudulent claim to the governmental entity within a reasonable time after discovery of the false or fraudulent claim.

235.   Defendants violated the Montana False Claims Act and knowingly caused false claims to be made, used and presented to the State of Montana by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

236.   The State of Montana, by and through the Montana Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by

healthcare providers and third party payers in connection therewith.

237.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Montana in connection with Defendants' conduct. Compliance with applicable Montana statutes and regulations was also a condition of payment of claims submitted to the State of Montana.

238.    Had the State of Montana known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

239.    As a result of Defendants' violations of the Montana False Claims Act, the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

240.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Montana False Claims Act on behalf of themselves and the State of Montana.

241.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF MONTANA:

> (1) Three times the amount of actual damages which the State of Montana has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Montana;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Montana False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**COUNT XVII**
**(Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*)**

242.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

243.    This is a *qui tam* action brought by the Relators on behalf of the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*

244.    N.R.S. § 357.040(1) provides liability for any person who -

(a) knowingly presents or causes to be presented a false claim for payment or approval;

(b) knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim;

(c) conspires to defraud by obtaining allowance or payment of a false claim;

(h) is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

245.    Defendants violated N.R.S. § 357.040(1) and knowingly false claims to be made, used and presented to the State of Nevada by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

246.    The State of Nevada, by and through the Nevada Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

247.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Nevada in connection with Defendants' conduct. Compliance with applicable Nevada statutes and regulations was also a condition of payment of claims submitted to the State of Nevada.

248.    Had the State of Nevada known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

249.    As a result of Defendants' violations of N.R.S. § 357.040(1), the State of Nevada has been damaged in an amount far in excess of millions of dollars exclusive of interest.

250.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.R.S. § 357.080(1) on behalf of themselves and the State of Nevada.

251.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request that this Court award the following damages to the following parties and against Defendants:

To the STATE OF NEVADA:

(1) Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $2,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Nevada;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to N.R.S. § 357.210 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XVIII
**(New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq*.)**

252.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

253.    This is a *qui tam* action brought by the Relators on behalf of the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-b *et seq.*, which provides that:

I.    Any person shall be liable who...

(a) knowingly presents, or causes to be presented, to an officer or employee of the State, a false or fraudulent claim for payment or approval;

(b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

254.    Defendants violated N.H. Rev. Stat. Ann. §167:61-b *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Hampshire by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

255.    The State of New Hampshire, by and through the New Hampshire Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

256.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Hampshire in connection with Defendants' conduct. Compliance with applicable New Hampshire statutes and regulations was also a condition of payment of claims submitted to the State of New Hampshire.

257.    Had the State of New Hampshire known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

258.    As a result of Defendants' violations of N.H. Rev. Stat. Ann. §167:61-b *et seq.*, the

State of New Hampshire has been damaged in an amount far in excess of millions of dollars exclusive of interest.

259.     Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.H. Rev. Stat. Ann. §167:61-b *et seq.* on behalf of themselves and the State of New Hampshire.

260.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Hampshire in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW HAMPSHIRE:

(1) Three times the amount of actual damages which the State of New Hampshire has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Hampshire;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to N.H. Rev. Stat. Ann § 167:61-b and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

**<u>COUNT XIX</u>**
**(New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*)**

261.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

262.    This is a *qui tam* action brought by the Relators on behalf of the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J.S.A. § 2A:32C-1 *et seq.*

263.    N.J.S.A. § 2A:32C-3, provides for liability for any person who:

(a) Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(c) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State;

(d) Has possession, custody, or control of public property or money used or to be used by the State and knowingly delivers or causes to be delivered less property than the amount for which the person receives a certificate or receipt;

(e) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the entity, makes or delivers a receipt without completely knowing that the information on the receipt is true;

(f) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any person who lawfully may not sell or pledge the property; or

(g) Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State.

264.    Defendants violated the New Jersey False Claims Act and knowingly caused false claims to be made, used and presented to the State of New Jersey by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in

connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

265.    The State of New Jersey, by and through the New Jersey Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

266.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Jersey in connection with Defendants' conduct. Compliance with applicable New Jersey statutes and regulations was also a condition of payment of claims submitted to the State of New Jersey.

267.    Had the State of New Jersey known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

268.    As a result of Defendants' violations of the New Jersey False Claims Act, the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

269.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the New Jersey False Claims Act on behalf of themselves and the State of New Jersey.

270.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the State of New Jersey in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW JERSEY:

(1) Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of New Jersey;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to New Jersey False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XX
**(New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*;**
**New Mexico Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-1 *et seq.*)**

271.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

272.    This is a *qui tam* action brought by the Relators on behalf of the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act, which provides in pertinent part as follows:

A person shall not:

(1) knowingly present, or cause to be presented, to an employee, officer or

agent of the state or to a contractor, grantee, or other recipient of state funds, a false or fraudulent claim for payment or approval;

(2) knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

(3) conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim . . . .

N.M. Stat. Ann. § 44-9-3(A)(1)-(3).

273.    Defendants violated N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* and knowingly caused false claims to be made, used and presented to the State of New Mexico by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

274.    The State of New Mexico, by and through the New Mexico Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

275.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New Mexico in connection with Defendants' conduct. Compliance with applicable New Mexico statutes and regulations was also a condition of payment of claims submitted to the State of New Mexico.

276.    Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims

submitted by healthcare providers and third party payers in connection with that conduct.

277.    As a result of Defendants' violations of N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.*, the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

278.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and N.M. Stat. Ann. § 44-9-1 *et seq.* on behalf of themselves and the State of New Mexico.

279.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW MEXICO:

(1) Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to N.M. Stat. Ann. §§ 27-14-1 *et seq.* and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXI
**(New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*)**

280.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

281.     This is a *qui tam* action brought by the Relators on behalf of the State of New York to recover treble damages and civil penalties under the New York State False Claims Act, N.Y. State Fin. Law § 188 *et seq.*, which imposes liability on any person who:

>  (a) knowingly presents, or causes to be presented, to any employee, officer or agent of the state or local government, a false or fraudulent claim for payment or approval;

>  (b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or local government; or

>  (c) conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

282.     Defendants violated the New York State False Claims Act, and knowingly caused false claims to be made, used and presented to the State of New York, by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

283.     The State of New York, by and through the New York Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

284.     Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of New York in connection with Defendants' conduct. Compliance with

applicable New York statutes and regulations was also a condition of payment of claims submitted to the State of New York.

285.    Had the State of New York known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

286.    As a result of Defendants' violations of the New York State False Claims Act, the State of New York has been damaged in an amount far in excess of millions of dollars exclusive of interest.

287.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the New York State False Claims Act, on behalf of themselves and the State of New York.

288.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New York in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF NEW YORK:

(1) Three times the amount of actual damages which the State of New York has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New York;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to the New York State False Claims Act, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XXII
**(North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*)**

289.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

290.    This is a *qui tam* action brought by the Relators on behalf of the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*

291.    North Carolina's False Claims Act, N.C.G.S.A. § 1-607, provides for liability for any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of subdivision (1), (2), (4), (5), (6), or (7) of this section;

(4) Has possession, custody, or control of property or money used or to be used by the State and knowingly delivers or causes to be delivered less than all of that money or property;

(5) Is authorized to make or deliver a document certifying receipt of property used or to be used by the State and, intending to defraud the

State, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) Knowingly buys, or receives as a pledge of an obligation or debt, public property from any officer or employee of the State who lawfully may not sell or pledge the property; or

(7) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the State.

292.   Defendants violated the North Carolina False Claims Act, and knowingly caused false claims to be made, used and presented to the State of North Carolina by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

293.   The State of North Carolina, by and through the North Carolina Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

294.   Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of North Carolina in connection with Defendants' conduct.  Compliance with applicable North Carolina statutes and regulations was also a condition of payment of claims submitted to the State of North Carolina.

295.   Had the State of North Carolina known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims

submitted by healthcare providers and third party payers in connection with that conduct.

296.    As a result of Defendants' violations of the North Carolina False Claims Act, the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

297.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the North Carolina False Claims Act on behalf of itself and the State of North Carolina.

298.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF NORTH CAROLINA:

(1)    Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of North Carolina;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to North Carolina False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXIII
### (Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*)

299.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

300.    This is a *qui tam* action brought by the Relators on behalf of the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. Stat. Ann. Tit. 63, § 5053 *et seq.*

301.    Oklahoma's Medicaid False Claims Act, 63 Okl. St. Ann. § 5053.1, provides for liability for any person who:

1.  Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

2.  Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

3.  Conspires to defraud the State by getting a false or fraudulent claim allowed or paid;

4.  Has possession, custody, or control of property or money used, or to be used, by the state and, intending to defraud the State or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

5.  Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the State and, intending to defraud the State, makes or delivers the receipt without completely knowing that the information on the receipt is true;

6.  Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, who lawfully may not sell or pledge the property; or

7.  Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit

money or property to the State.

302.    Defendants violated the Oklahoma Medicaid False Claims Act and knowingly caused false claims to be made, used and presented to the State of Oklahoma by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

303.    The State of Oklahoma, by and through the Oklahoma Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

304.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Oklahoma in connection with Defendants' conduct.  Compliance with applicable Oklahoma statutes and regulations was also a condition of payment of claims submitted to the State of Oklahoma.

305.    Had the State of Oklahoma known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

306.    As a result of Defendants' violations of the Oklahoma Medicaid False Claims Act, the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

307.    Relators are person with direct and independent knowledge of the allegations of

this Complaint, who have brought this action pursuant to the Oklahoma Medicaid False Claims Act on behalf of itself and the State of Oklahoma.

308.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF OKLAHOMA:

(1)    Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Oklahoma;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Oklahoma Medicaid False Claims Act and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXIV
### (Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*)

309.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

310.    This is a *qui tam* action brought by the Relators on behalf of the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.*

311.    Rhode Island's False Claims Act, Gen. Laws 1956, § 9-1.1-3, provides for liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

> (3) conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

> (4) has possession, custody, or control of property or money used, or to be used, by the state and, intending to defraud the state or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

> (5) authorized to make or deliver a document certifying receipt of property used, or to be used, by the state and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

> (6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, or a member of the guard, who lawfully may not sell or pledge the property; or

> (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state.

312.    Defendants violated the Rhode Island False Claims Act and knowingly caused false claims to be made, used and presented to the State of Rhode Island by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

313.    The State of Rhode Island, by and through the Rhode Island Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

314.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Rhode Island in connection with Defendants' conduct.  Compliance with applicable Rhode Island statutes and regulations was also a condition of payment of claims submitted to the State of Rhode Island.

315.    Had the State of Rhode Island known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

316.    As a result of Defendants' violations of the Rhode Island False Claims Act, the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

317.    Relators are person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Rhode Island False Claims Act on behalf of itself and the State of Rhode Island.

318.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

WHEREFORE, Relators respectfully requests this Court to award the following damages

to the following parties and against Defendant:

To the STATE OF RHODE ISLAND:

    (1)    Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendants' conduct;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Rhode Island;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to Rhode Island False Claims Act and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XXV
### (Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)

319.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

320.    This is a *qui tam* action brought by the Relators on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

321.    Section 71-5-182(a)(1) provides liability for any person who:

    **a.**  presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

    **b.**  makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or

approved by the state knowing such record or statement is false;

**c.** conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

322. Defendants violated Tenn. Code Ann. § 71-5-1 82(a)(1) and knowingly caused false claims to be made, used and presented to the State of Tennessee by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

323. The State of Tennessee, by and through the Tennessee Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

324. Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Tennessee in connection with Defendants' conduct. Compliance with applicable Tennessee statutes and regulations was also a condition of payment of claims submitted to the State of Tennessee.

325. Had the State of Tennessee known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

326. As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

327. Relators are persons with direct and independent knowledge of the allegations of

this Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on

behalf of themselves and the State of Tennessee.

328.    This Court is requested to accept supplemental jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate

damage to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages

to the following parties and against Defendants:

To the STATE OF TENNESSEE:

> (5) Three times the amount of actual damages which the State of Tennessee has
> sustained as a result of Defendants' conduct;
>
> (6) A civil penalty of not less than $5,000 and not more than $10,000 for each false
> claim which Defendants caused to be presented to the State of Tennessee;
>
> (7) Prejudgment interest; and
>
> (8) All costs incurred in bringing this action.

To Relators:

> (5) The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c)
> and/or any other applicable provision of law;
>
> (6) Reimbursement for reasonable expenses which Relators incurred in connection
> with this action;
>
> (7) An award of reasonable attorneys' fees and costs; and
>
> (8) Such further relief as this Court deems equitable and just.

### COUNT XXVI
**(Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 *et seq.*)**

329.    Relators reallege and incorporate by reference the prior paragraphs as though fully

set forth herein.

330.    This is a *qui tam* action brought by the Relators on behalf of the State of Texas to

recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

331.   V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who –

(1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:

    (a) on an application for a contract, benefit, or payment under the Medicaid program; or

    (b) that is intended to be used to determine its eligibility for a benefit or payment under the Medicaid program

(2) knowingly or intentionally concealing or failing to disclose an event:

    (a) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of:

        (i)  the person, or

        (ii) another person on whose behalf the person has applied       for   a benefit or payment or is receiving a benefit or payment; and

    (b) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;

\* \* \*

(4) knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

\* \* \*

    (b) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5) knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

332.   Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used and presented to the State of Texas by engaging in the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

333.    The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

334.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct. Compliance with applicable Texas statutes and regulations was also a condition of payment of claims submitted to the State of Texas.

335.    Had the State of Texas known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

336.    As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

337.    Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and has not otherwise furnished information to the State regarding the claims for reimbursement at issue.

338.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on

behalf of themselves and the State of Texas.

339.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF TEXAS:

(1) Two times the amount of actual damages which the State of Texas has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $10,000 pursuant to V.T.C.A. Hum. Res. Code § 36.025(a)(3) for each false claim which Defendants cause to be presented to the state of Texas;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XXVII
**(Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*)**

340.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

341.    This is a *qui tam* action brought by the Relators on behalf of the State of Vermont

to recover treble damages and civil penalties under the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*

342.   Vt. Stat. Ann. tit. 32, § 631 in pertinent part provides for liability for any person who:

>   (1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval;
>
>   (2) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim;
>
>   (3) knowingly present, or cause to be presented, a claim that includes items or services resulting from a violation of 13 V.S.A. chapter 21 or section 1128B of the Social Security Act, 42 U.S.C. §§ 1320a-7b;
>
>   (4) knowingly present, or cause to be presented, a claim that includes items or services for which the State could not receive payment from the federal government due to the operation of 42 U.S.C. § 1396b(s) because the claim includes designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) furnished to an individual on the basis of a referral that would result in the denial of payment under 42 U.S.C. chapter 7, subchapter XVIII (the "Medicare program"), due to a violation of 42 U.S.C. § 1395nn;
>
>   (5) knowingly make, use or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State;
>
>   (6) knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the State; or
>
>   (7) conspire to commit a violation of this subsection.

343.   Defendants violated the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Vermont by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

344.   The State of Vermont, by and through the Vermont Medicaid program and other

state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

345.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Vermont in connection with Defendants' conduct. Compliance with applicable Vermont statutes and regulations was also a condition of payment of claims submitted to the State of Vermont.

346.    Had the State of Vermont known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

347.    As a result of Defendants' violations of the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, the State of Vermont has been damaged in an amount far in excess of millions of dollars exclusive of interest.

348.    Relators are person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Vt. Stat. Ann. tit. 32, § 630, *et seq.*, on behalf of itself and the State of Vermont.

349.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF VERMONT:

    (1)    Three times the amount of actual damages which the State of Vermont has sustained as a result of Defendants' conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Vermont;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in investigating and bringing this action.

To Relators:

    (1)    The maximum amount allowed pursuant to the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*, and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

### COUNT XXVIII
**(Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*)**

350.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

351.    This is a *qui tam* action brought by the Relators on behalf of the State of Washington to recover treble damages and civil penalties under the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*

352.    RCWA 74.66.020 in pertinent part provides for liability for any person who:

    (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(c) Conspires to commit one or more of the violations in this subsection (1).

353.    Defendants violated the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*, and knowingly caused false claims to be made, used and presented to the State of Washington by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

354.    The State of Washington, by and through the Washington Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

355.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Washington in connection with Defendants' conduct. Compliance with applicable Washington statutes and regulations was also a condition of payment of claims submitted to the State of Washington.

356.    Had the State of Washington known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

357.    As a result of Defendants' violations of the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.*, the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

358.    Relators are persons with direct and independent knowledge of the allegations of

this Complaint, who has brought this action pursuant to the Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.* on behalf of itself and the State of Washington.

359.    This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the STATE OF WASHINGTON:

(1)    Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' conduct;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Washington;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To Relators:

(1)    The maximum amount allowed pursuant to Washington Medicaid Fraud Act, Wash. Rev. Code Ann. § 74.66.005 *et seq.* and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXIX
### (Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*)

360.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

361.    This is a *qui tam* action brought by the Relators on behalf of the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.*

362.    The Wisconsin False Claims Act, W.S.A. § 20.931 *et seq.* provides for liability for any person who:

> (a) Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.
> (b) Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.
>
> (c) Conspires to defraud this state by obtaining allowance or payment of a false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program.
>
>       \*    \*    \*
>
> Knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease any obligation to pay or transmit money or property to the Medical Assistance program.
>
> (g) Is a beneficiary of the submission of a false claim for medical assistance to any officer, employee, or agent of this state, knows that the claim is false, and fails to disclose the false claim to this state within a reasonable time after the person becomes aware that the claim is false.

363.    Defendants violated the Wisconsin False Claims Act and knowingly caused false claims to be made, used and presented to the State of Wisconsin by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded

healthcare programs.

364.    The State of Wisconsin, by and through the Wisconsin Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

365.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the State of Wisconsin in connection with Defendants' conduct. Compliance with applicable Wisconsin statutes and regulations was also a condition of payment of claims submitted to the State of Wisconsin.

366.    Had the State of Wisconsin known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

367.    As a result of Defendants' violations of the Wisconsin False Claims Act, the State of Wisconsin has been damaged in an amount far in excess of millions of dollars exclusive of interest.

368.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Wisconsin False Claims Act on behalf of themselves and the State of Wisconsin.

369.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Wisconsin in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the STATE OF WISCONSIN:

(1) Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Wisconsin;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Wisconsin False Claims Act and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXX
### (Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*)

370.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

371.    This is a *qui tam* action brought by the Relators on behalf of the Commonwealth of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Ch. 12 § 5(A) *et seq.*

372.    Mass. Gen. Laws Ann. Ch. 12 § 5B provides liability for any person who-

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or

statement to obtain payment or approval of a claim by the commonwealth; or

(3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

* * *

(9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

373. Defendants violated Mass. Gen. Laws Ann. Ch. 12 § 5B and knowingly caused false claims to be made, used and presented to the Commonwealth of Massachusetts by the conduct alleged herein and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

374. The Commonwealth of Massachusetts, by and through the Massachusetts Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

375. Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the Commonwealth of Massachusetts in connection with Defendants' conduct. Compliance with applicable Massachusetts statutes and regulations was also a condition of payment of claims submitted to the Commonwealth of Massachusetts.

376. Had the Commonwealth of Massachusetts known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that

conduct.

377.    As a result of Defendants' violations of Mass. Gen. Laws Ann. Ch. 12 § 5B, the Commonwealth of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

378.    Relators are persons with direct and independent knowledge of the allegations in this Complaint, who have brought this action pursuant to Mass. Gen. Laws Ann. Ch. 12 § 5(c)(2) on behalf of themselves and the Commonwealth of Massachusetts.

379.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Massachusetts in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the Commonwealth OF MASSACHUSETTS:

(1) Three times the amount of actual damages which the Commonwealth of Massachusetts has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Massachusetts;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Ch. 12, § 5F and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXXI
### (Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*)

380.    Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

381.    This is a *qui tam* action brought by the Relators on behalf of the Commonwealth of Virginia for treble damages and penalties under Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*, which provides liability for any person who-

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or

> (3) conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

> * * *

> (9) is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

382.    Defendants violated Virginia's Fraud Against Tax Payers Act, § 8.01-216.3a, and knowingly caused false claims to be made, used and presented to the Commonwealth of Virginia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the Government-funded healthcare programs.

383.    The Commonwealth of Virginia, by and through the Virginia Medicaid program and other state healthcare programs, and unaware of Defendants' conduct, paid the claims

submitted by healthcare providers and third party payers in connection therewith.

384.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' conduct.  Compliance with applicable Virginia statutes and regulations was also a condition of payment of claims submitted to the Commonwealth of Virginia.

385.    Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

386.    As a result of Defendants' violations of Virginia's Fraud Against Tax Payers Act, §8.01-216.3a, the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

387.    Relators are persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Virginia's Fraud Against Tax Payers Act, §8.01-216.3, on behalf of itself and the Commonwealth of Virginia.

388.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendant:

To the COMMONWEALTH OF VIRGINIA:

(1) Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to VA Code Ann. § 32.1-315 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

### COUNT XXXII
**(District of Columbia Procurement Reform Amendment Act,
D.C. Code Ann. § 2-308.13 *et seq.*)**

389.     Relators reallege and incorporate by reference the prior paragraphs as though fully set forth herein.

390.     This is a *qui tam* action brought by the Relators and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. § 2-308.13 *et seq.*

391.     D.C. Code § 2-308.14(a) provides liability for any person who-

(1) knowingly presents, or causes to be presented, to an officer or employee of the District, a false claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false claim paid or approved by the District;

(3) conspires to defraud the District by getting a false claim allowed or paid by the District;

* * *

is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

392.    Defendants violated D.C. Code § 2-308.14(a) and knowingly caused false claims to be made, used and presented to the District of Columbia by its deliberate and systematic violation of federal and state laws and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government-funded healthcare programs.

393.    The District of Columbia, by and through the District of Columbia Medicaid program and other District healthcare programs, and unaware of Defendants' illegal conduct, paid the claims submitted by healthcare providers and third party payers in connection therewith.

394.    Compliance with the Anti-Kickback Statute and applicable Medicare, Medicaid and the various other federal and state laws cited herein was a condition of payment of claims submitted to the District of Columbia in connection with Defendants' conduct. Compliance with applicable District of Columbia statutes and regulations was also a condition of payment of claims submitted to the District of Columbia.

395.    Had the District of Columbia known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

396.    As a result of Defendants' violations of D.C. Code § 2-308.14(a), the District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

397.    Relators are persons with direct and independent knowledge of the allegations of

this Complaint, who have brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of themselves and the District of Columbia.

398.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

WHEREFORE, Relators respectfully request this Court to award the following damages to the following parties and against Defendants:

To the DISTRICT OF COLUMBIA:

(1) Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' illegal conduct;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the District of Columbia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relators:

(1) The maximum amount allowed pursuant to D.C. Code § 2-308.15(f) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## JURY TRIAL DEMANDED

399.   Relators demand a jury trial.

DATED: July 20, 2016                    Respectfully submitted,


                                        **KENDALL LAW GROUP, PLLC**

                                        By: _Joe Kendall_____
                                             JOE KENDALL
                                             Texas Bar No. 11260700
                                             JKENDALL@KENDALLLAWGROUP.COM
                                             JODY RUDMAN
                                             Texas Bar No. 00797356
                                             JRUDMAN@KENDALLLAWGROUP.COM
                                             3232 McKinney Avenue, Suite 700
                                             Dallas, Texas  75204
                                             Telephone:  (214) 744-3000
                                             Facsimile:  (214) 744-3015

                                        **THE WEISER LAW FIRM, P.C.**
                                        CHRISTOPHER L. NELSON
                                        CLN@WEISERLAWFIRM.COM
                                        JAMES M. FICARO
                                        JMF@WEISERLAWFIRM.COM
                                        ROSS M. WOLFE
                                        RMW@WEISERLAWFIRM.COM
                                        22 Cassatt Avenue
                                        Berwyn, PA 19312
                                        Telephone: (610) 225-2677
                                        Facsimile: (610) 408-8062


                                        *Attorneys for Relators*

JS 44-TXND (Rev. 4/13)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
UNITED STATES OF AMERICA, ET AL. - PLEASE SEE ATTACHED

**DEFENDANTS**
ABBVIE INC. and ABBVIE ENDOCRINOLOGY, INC. D/B/A PHARMACY SOLUTIONS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    LAKE
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

RECEIVED
JUL 2 0 2016
CLERK, U.S. COURT
NORTHERN DISTRICT

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Joe Kendall, Jody Rudman, Kendall Law Group, PLLC, 3232 McKinney Ave., Suite 700, Dallas, TX 76204, 214/744-3000

Attorneys *(If Known)*

3-16 CV2111-G

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question *(U.S. Government Not a Party)*
☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. § 3730
Brief description of cause:
FEDERAL FALSE CLAIMS ACT

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions)*
JUDGE                                   DOCKET NUMBER

DATE
07/20/2016

SIGNATURE OF ATTORNEY OF RECORD
*Joe Kendall*

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE

**ADDITIONAL PLAINTIFFS**:

UNITED STATES OF AMERICA,
the States of CALIFORNIA, COLORADO,
CONNECTICUT, DELAWARE, FLORIDA,
GEORGIA, HAWAII, ILLINOIS,
INDIANA, IOWA, LOUISIANA, MARYLAND,
MICHIGAN, MINNESOTA, MONTANA,
NEVADA, NEW HAMPSHIRE, NEW JERSEY,
NEW MEXICO, NEW YORK, NORTH CAROLINA,
OKLAHOMA, RHODE ISLAND, TENNESSEE,
TEXAS, VERMONT, WASHINGTON,
WISCONSIN, the Commonwealth of MASSACHUSETTS,
VIRGINIA, and the DISTRICT OF COLUMBIA *ex rel.*,
ASHLEY MILLER and SAKSF, LLC


**CO-COUNSEL**:

**THE WEISER LAW FIRM, P.C.**
CHRISTOPHER L. NELSON
CLN@WEISERLAWFIRM.COM
JAMES M. FICARO
JMF@WEISERLAWFIRM.COM
ROSS M. WOLFE
RMW@WEISERLAWFIRM.COM
22 Cassatt Avenue
Berwyn, PA 19312
Telephone: (610) 225-2677
Facsimile: (610) 408-8062